# IN THE UNITED STATES DISTRICT COURT FOR THE
# EASTERN DISTRICT OF VIRGINIA

### Alexandria Division

Irvin Daniel Grove, Jr.,        )
     Plaintiff,            )
                             )
v.                         )       1:18cv431 (LO/JFA)
                             )
Dr. Rodgers, et al.,         )
     Defendants.       )

## MEMORANDUM OPINION

Irvin Daniel Grove, Jr., a Virginia inmate proceeding pro se ("Grove" or "plaintiff"), has filed a civil rights complaint pursuant to 42 U.S.C. § 1983, alleging that he suffered deliberate indifference to his serious medical needs in two respects at the Riverside Regional Jail ("RRJ"). The matter is presently before the Court on a Motion for Summary Judgment filed jointly by defendants Pamela Hicks-van Haren, Imhotep Carter, M.D., Stephen Lemmons, R.N., and Patricia Rodgers, D.O.[1] Plaintiff has filed objections, and the movants have filed a reply. After careful consideration, for the reasons which follow, the Motion for Summary Judgment will be granted.

## I. Background

Grove commenced this lawsuit in April, 2018, alleging that defendants at RRJ were deliberately indifferent to (1) a spinal condition and (2) a fractured nose. In the amended complaint, which is the operative complaint in the lawsuit, he contends that he had been pleading for months that he was experiencing severe pain in his lower back and hip and a burning down his legs when Dr. Rodgers ordered x-rays in February, 2017. [Dkt. No. 3 at 5] The x-rays

---

[1] Throughout the pleadings, this defendant's surname is spelled alternately as "Rogers" and "Rodgers." The Court has adopted the spelling used in her declaration. [Dkt. No. 34, Ex. 6]

showed that Grove had a degenerative disc and a one-centimeter slippage of his L-4 vertebra. Id. According to Grove, Dr. Rodgers told him he would have to learn to live with his condition. Id. Grove states that Dr. Rodgers denied him pain medication because he admittedly had used cocaine in the past and as a result she told him that "nothing will work for your pain." Id. Grove further alleges that he was denied a bottom bunk profile. Id.

In November, 2017, Grove was seen by the "head doctor," Dr. Carter, who sent him to a location in Colonial Heights for physical therapy. The therapist told Grove that therapy would not help him because "it was be[y]ond that." Id.

In February, 2018, a new doctor, Dr. Banks, saw Grove and "took [him] serious." Id. at 6. On March 19, 2018, Grove was transported to Colonial Orthopedics, where new x-rays revealed that the disc between his L-4 and L-5 vertebrae was "completely gone" and "it was bone on bone," with the result that "the nerve damage was now likely permanent." Id. The orthopedist said Grove needed an MRI to assess the damage to his soft tissue. Id. Grove reiterated his request for a bottom bunk, and on April 23, 2018 Ms. Hicks van-Haren responded that the doctor has not ordered a bottom bunk for you at this time. Id.

On April 17, 2018, Grove suffered a broken nose. Id. at 8. He sought care the next day for additional complaints but Charge Nurse Lemmons said "I just saw you yesterday" and told Grove that it didn't matter how badly the nose was broken, "we will take care of it." Id. at 9.[2] On April 25, 2018, Grove was called to the medical department and spoke to Ms. Hicks-van Haren, who introduced herself as the Medical Administrator of RRJ and told Grove that "things

---

[2]Defendant Dr. Bomar provided the medical care for Grove's broken nose, and has filed a separate Motion for Summary Judgment in this lawsuit. [Dkt. No. 40]

take time even on the street." Id. at 10. Grove responded that his nose was disfigured and "should have been attended to when it happened." Id. Ms. Hicks-van Haren told Grove he would be seen by an ear, nose and throat doctor. Id. at 11.

Grove alleges in this action pursuant to § 1983 that the defendants were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment. He seeks monetary damages as well as injunctive relief in the form of an order directing that he receive proper treatment for his spine and to have his nose "fixed." Id. at 11. Defendants Dr. Rodgers, Ms. Hicks-van Haren, Dr. Carter and Nurse Lemmons jointly filed the Motion for Summary Judgment under consideration along with a supporting memorandum of law and exhibits, and supplied Grove with the notice required by Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975) and Local Civ. R. 7(J). [Dkt. No. 33-35] Grove has filed an opposition [Dkt. No. 37], and defendants have submitted a reply. [Dkt. No. 42] Accordingly, this matter is now ripe for disposition.

## II. Standard of Review

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial burden of showing that there are no genuine, material factual disputes and that it is entitled to judgment based on those facts. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the movant has met its initial burden, the burden shifts to the non-moving party to point out the specific facts which create disputed issues. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Matsushita Electrical Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). Summary judgment is appropriate only where no

3

material facts are genuinely disputed and the evidence as a whole could not lead a rational factfinder to rule for the non-moving party. <u>Matsushita</u>, 475 U.S. at 587.

### III. Undisputed Material Facts

The following material facts are undisputed.

A. <u>Grove's Grievance Records</u>

1. During the time period relevant to this lawsuit, RRJ's medical department had in effect a formal grievance procedure, which is a mechanism for inmates to grieve issues relating to jail policy, procedures, and treatment, including health complaints. [Dkt. No. 34, Ex. B, Hicks-van Haren Aff. ¶ 8]

9. When an RRJ inmate files a grievance regarding his medical care it is forwarded to Pamela Hicks-van Haren, the Health Services Administrator at RRJ. <u>Id.</u> ¶¶ 2, 10. Ms. Hicks-van Haren, the Director of Nursing, or a designee will investigate the complaint and provide the inmate with a written grievance response within seven (7) business days. <u>Id.</u> ¶ 11. If the inmate is dissatisfied he may appeal the response to his grievance, and the grievance process is not complete unless he does so. <u>Id.</u> ¶¶ 5-6.

10. On April 18, 2018, Grove filed a grievance with respect to his broken nose. <u>Id.</u> ¶ 23. Hicks-van Haren responded on April 25, 2018 that she had met with Grove and he had been referred to an ENT specialist, but the process of scheduling outside medical appointments took time.

11. On May 2, 2018, Grove appealed the response to his grievance. He received a response to his grievance appeal on May 17, 2018, "thereby exhausting the grievance process." <u>Id.</u> ¶ 23.

4

B. Grove's Medical Records

1. On September 7, 2016, Grove was seen by a nurse practitioner for complaints of chronic back pain and requests for Gabapentin (a medication used to treat nerve pain), a two-piece jumper, and a bottom bunk profile. [Dkt. No. 34, Ex. A, Carter Aff. ¶ 6] Upon examination, Grove appeared to have full range of motion with no deformity, spasms or edema, he ambulated well without assistance, and he manipulated the examination table well. The nurse practitioner determined that Grove did not require the requested items, and Grove became upset and stated that he would write grievances until he got what he wanted. Id.

2. On October 4, 2016, Dr. Carter saw Grove for complaints of back, hip and leg pain which Grove stated had been going on for several years. Id. ¶ 7. Dr. Carter noted no abnormalities in Grove's extremities, gait or posture, and observed that he could climb onto the examination table without difficulty. To Dr. Carter, "Mr. Grove's presentation indicated that his reported pain did not significantly impair his activities of daily living." Id. Because Grove's clinical presentation ruled out significant back abnormalities, Dr. Carter determined that his pain could be managed conservatively and order a short course of Gabapentin. Id. In addition, a two-piece jumpsuit is indicated only where there is significant orthopedic or neurological impairment, and Dr. Carter determined that Grove was not qualified to receive that accommodation. Id.

3. Based upon Grove's subjective complaints and clinical presentation, Dr. Carter believed that he had degenerative disc disease ("DDD"), the most frequent cause of lower back pain. Id. ¶ 8. DDD is a common disorder that occurs when the rubbery discs lose integrity as a normal process of aging, and while disc degeneration is likely to progress over time, the pain from DDD does not get worse and in fact usually improves as the vertebral segments stabilize

over time.  It cannot be cured.  <u>Id.</u>

4. Pain control for DDD and similar conditions must be balanced with the patient's need to function in life and to minimize the risk of prescription drug abuse.  <u>Id.</u> ¶ 9.  While excessive medication may ease or resolve a patient's pain, it also will threaten the patient's health and undermine his quality of life.  Pain treatment thus is aimed at maintaining the patient's level of function while addressing his pain complaints.  <u>Id.</u>

5. Prescription drug abuse has become a rampant national problem, and in the prison setting pain medications must be prescribed based upon the physicians' clinical and objective physical findings.  <u>Id.</u> ¶10. Pain medications, including narcotic and narcotic-like pain relievers, can be very dangerous in institutions because inmates use them illicitly to get high, trade them for contraband, and use them in suicide attempts.  Even if an inmate does not misuse such a prescription, he can become a target of violence or manipulation by other inmates who wish to obtain the drugs.  In addition, many inmates, like Grove, have histories of drug abuse and their use of a narcotic pain reliever can cause a recurrence of dependence.  <u>Id.</u>

6. For these reasons, long-term pain management with narcotic pain relievers generally is not appropriate in the prison setting. <u>Id.</u> ¶ 11.

7. The standard care for back pain such as that experienced by Grove involves conservative measures such as hot or cold packs, rest, strengthening exercises, and physical therapy.  <u>Id.</u> ¶ 12.  A wide range of medications also are employed for chronic back pain, including analgesics such as acetaminophen, NSAIDs such as ibuprofen and Naproxen, Gabapentin for nerve pain, antidepressants, and counter-irritants that reduce inflamation. Surgery generally is not indicated for DDD unless the spinal nerves are significantly affected by lumbar

disc disease. Even when nerve involvement is shown, the need for surgery depends in part to how the patient responds to less invasive approaches. Id.

8. On December 23, 2016, Dr. Rodgers saw Grove for complaints of lower back pain. [Dkt. No. 34, Ex. C, Rodgers Aff. ¶ 6] Grove reported a history of DDD. Upon examination, Grove's spine was erect, the left side of his pelvis was higher than the right, and his left leg was longer than his right. A straight leg test, which is given to test for lumbar disc herniation, was negative, and a heel-to-toe walk indicated normal muscle strength. Grove's lumbar flexion was within normal limits. Based on Grove's complaints of pain, Dr. Rodgers prescribed a short-term prescription of narcotic pain medication and advised Grove to continue using NSAIDs. Id. Dr. Rodgers noted that she would consider Nortriptyline at a later time. Id.

9. On December 27, 2016, Dr. Rodgers noted that Ultracet (a narcotic) was not available and that she would prescribe Carbamazepine, an anticonvulsant used to treat nerve pain, for two months. Id. ¶ 13.

10. On January 10, 2017, a nurse saw Grove for his complaints that his medications were not effective to treat his pain. Id. ¶ 14. Dr. Rodgers ordered Nortriptyline for thirty days. Id.

11. On February 2, 2017, Dr. Rodgers saw Grove for complaints of chronic lower back pain and a report of a collapsed disc in his spine. Id. ¶ 15. Grove reported a pain level of 10 out of 10 and a burning sensation in his left buttock. Grove requested Tramadol, a narcotic-like medication. After examining Grove, Dr. Rodgers noted that his affect and clinical condition were inconsistent with his description of his pain, and she ordered methocarbamol, a muscle relaxant, and discontinued Nortriptyline. She also advised Grove to continue exercise therapy and to ask his psychiatrist about Duloxetine, a medication that treats mental heath disorders such

as depression and anxiety as well as nerve pain. Dr. Rodgers also ordered x-rays to determine if Grove had spondylolisthesis. In addition, she counseled Grove about chronic versus acute pain, advised him that Tramadol is not indicated for chronic pain, and explained that the goal of therapy is to assist the patient in learning how to live with pain. Id.

12. On February 13, 2017, plaintiff received an x-ray of his lumbar spine which indicated that he suffered from grade 1 spondylolisthesis. Id. ¶ 16.

13. Spondylolisthesis is characterized by slippage of the vertebrae. Id. ¶ 17. Grade 1 is the least advanced form, while grade 5 is the most advanced. Spondylolisthesis can be caused by degeneration of the spine and may cause such symptoms as back stiffness, tight hamstrings, and difficulty standing and walking. Initial treatment for spondylolisthesis is similar to that for DDD: rest, NSAIDs, and exercise to improve flexibility and strength. Surgery may become necessary if the vertebrae continue to slip or if the pain worsens to the point that the patient's daily living activities are affected. Id.

14. Dr. Rodgers saw Grove for a follow-up to the x-ray on March 8, 2017. Id. ¶ 18. Grove complained of continued lower back pain radiating into his left leg, and he requested a profile for a two-piece jumpsuit and a prescription for Tramadol, which another inmate on his housing unit allegedly was receiving for injures sustained in a car accident in 2009. Dr. Rodgers discontinued Grove's methocarbamol and submitted a request for Duloxetine, noting that if the latter was approved she would ask Grove's psychiatrist to discontinue Venlafaxine, a medication that has similar effects. She determined that Grove was not eligible for a two-piece jumper because he was not disabled, and she also prescribed Naproxen. She provided Grove with information about lower back pain and spondylolisthesis, including appropriate exercises for pain relief, and instructed him regarding the use of NSAIDs and heat therapy. She further

counseled him that injections, physical therapy, and surgery as a last resort were treatment options for unrelieved lumbar pain. Id.

15. On June 29, 2017, Dr. Rodgers saw Grove for a follow-up to an offsite gastroenterology visit. Id. ¶ 23. He complained that his back pain had increased over the past month, and Dr. Rodgers ordered a Lidocaine patch (a local anesthetic that relieves nerve pain), Duloxetine, and ibuprofen. Id.

16. In early September, 2017, Grove was released from RRJ, and he returned about ten days later. Id. ¶ 25. He reported that during his release he had obtained Tramadol and used more than was prescribed. He also admitted to cocaine use. Id.

17. On October 10, 2017, Dr. Carter saw Grove for colitis, or chronic inflammatory bowel disease. [Dkt. No. 34, Ex. A, Carter Aff. ¶ 13] Grove reported doing well overall but stated that he had chronic left hip and lower back pain which had developed six years earlier. Dr. Carter noted Grove's substance abuse history and a recent steroid taper, and observed that Grove appeared healthy, had a normal gait and station, and was able to climb on and off the examination table without difficulty. Clinically, Grove did not exhibit significant functional abnormalities. Dr. Carter prescribed Naproxen, a non-steroidal anti-inflammatory that treats pain and swelling, and explained to Grove the structural abnormalities of his spine and the chronic nature of his complaints. Dr. Carter also requested a physical therapy evaluation for Grove. Id.

18. In Dr. Carter's medical opinion, Grove did not require further measures such as diagnostic testing or referral for an orthopedic examination because Grove did not exhibit significant functional impairments. Id. ¶ 14. Instead, Dr. Carter believed that conservative measures, such as Naproxen for pain and physical therapy for better strength, mobility and range

of motion were appropriate at that time. In Dr. Carter's view, Grove did not exhibit a need for medications stronger than Naproxen, which is appropriate to treat chronic lower back pain. Moreover, stronger pain medications such as narcotics are not indicated for chronic pain treatment, especially in patients like Grove who have histories of substance abuse. Id.

19. Grove saw a physical therapist on October 30, 2017. The therapist reviewed a home exercise plan with Grove and applied electrical stimulation and hot and cold packs. Id. ¶ 15.

20. Between October, 2017 and March 26, 2018, Grove was seen and evaluated by RRJ's on-site providers, including Dr. Banks, Dr. Rodgers, and Dr. Bomar, on six occasions. Id. ¶ 16. During these appointments, Grove was examined, and a treatment plan including exercise and medications was implemented. Id. Dr. Rodgers saw Grove on November 13, 2017, noted that he exhibited normal gait and movement, and prescribed Prednisone and an injection of Ketorolac, an NSAID used for short-term treatment of moderate to severe pain. [Dkt. No. 34, Ex. C, Rodgers Aff. ¶ 26] In Dr. Rodgers' medical opinion, Grove did not require more treatment than that rendered for his lumbar spine complaints, because he did not exhibit significant functional limitations which would indicate that further treatment options or accommodations were needed. Id. 27-28. Dr. Rodgers was not involved in Grove's medical treatment after November 13, 2017. Id. ¶ 26.

21. When Grove reported that his pain was unrelieved by the measures prescribed by Dr. Rodgers, Dr. Banks requested an orthopedic consultation. [Dkt. No. 34, Ex. A, Carter Aff. ¶ 16]

22. On March 19, 2018, Grove was seen by an orthopedist who ordered an MRI of his spine and prescribed Gabapentin. Id. ¶ 17. Dr. Bomar implemented these orders on March 22, 2018. Id.

23. Dr. Carter saw Grove for continuing complaints of lower back pain on March 26, 2018. Id. ¶ 18. He noted that an MRI had been recommended by an orthopedist, and he observed that Grove was able to climb on and off the examination table without assistance or difficulty. Dr. Carter submitted a request for an MRI which was later cancelled as duplicative of Dr. Bomar's, and ordered a two-piece jumpsuit for Grove. Because Grove was able to manipulate the examination table without difficulty, Dr. Carter did not believe that further accommodations such as a bottom bunk profile were necessary. Id. Dr. Carter has not evaluated Grove since March 27, 2018. Id. ¶ 19.

24. On April 17, 2018, Stephen Lemmons, R.N. evaluated Grove for a displaced nose and abrasions. [Dkt. No. 34, Ex. D, Lemmons Aff. ¶ 5]

25. Nurse Lemmons consulted Dr. Bomar regarding Grove's broken nose, and Dr. Bomar ordered an x-ray, one dose of Tylenol #4 which contains codeine, a course of Tylenol through April 23, 2018, and a follow-up appointment. Id.

26. One day later, Grove returned to the medical unit requesting a status update on the course of treatment for his nose injury. Id. ¶ 6. Grove did not appear to be in acute distress, nor did he exhibit an urgent medical need. He did not request pain medication but sought to be sent to a plastic surgeon. Nurse Lemmons told Grove that Dr. Bomar had seen him the previous day and would determine a course of treatment for Grove's nose at their next appointment. Id. Lemmons did not believe that Grove required additional pain medication because Dr. Bomar had assessed him the day before and had prescribed Tylenol for pain. Further, Grove also had a prescription for Excedrin. Id.

27. Nurse Lemmons cannot prescribe medication for inmates, nor can he determine their

courses of treatment. Id. ¶ 7. He believed that Grove's complaints regarding his nose fracture had been addressed by Dr. Bomar and would be further assessed at their scheduled follow-up appointment. Id. ¶ 7.

29. On April 19, 2018, Ms. Hicks-van Haren responded to Grove's complaints that he had not been seen following the x-rays of his broken nose. [Dkt. No. 34, Ex. B, Hicks-van Haren Aff. ¶ 26] She reviewed Grove's medical record and noted that a request for an off-site evaluation was in process, and she thus believed that his concerns about his nose were being addressed. Grove also requested a bottom bunk profile due to his lower back pain as well as a Common Fare diet. Ms. Hicks-van Haren noted in Grove's medical records that Dr. Carter had determined on March 26, 2018 that a bottom bunk was not medically indicated because Grove was able to manipulate the examination table without difficulty, and she also informed Grove that the medical staff at RRJ did not order Common Fare diets. Id.

30. On April 25, 2018, Ms. Hicks van-Haren and a nurse met with Grove regarding his complaints of pain from his nasal fracture. Id. ¶ 27. She explained to Grove that an appointment with a doctor was pending and that he needed to be patient. Grove asked for Tramadol for his pain, and Ms. Hicks van-Haren told him that she would notify Dr. Bomar of his request. When Ms. Hicks van-Haren did so Dr. Bomar determined that Tramadol was not appropriate at that time, and he ordered ibuprofen and renewed the previous request for an off-site evaluation of Grove's broken nose. Id.

31. Ms. Hicks van-Haren has no role in reviewing or approving requests for off-site medical appointments, nor does she schedule such an appointment once it is approved. Id. ¶ 28. She counseled Grove as to the offsite appointment process and explained that scheduling an

appointment is dependent on the availability of the practitioner and security needs. <u>Id.</u>

32. Grove thereafter continued to receive treatment for both his lumbar pain and his broken nose. [Dkt. No. 34, Ex. A, Carter Aff. ¶ 20] On June 7, 2018 he underwent a closed nasal reduction, which is a procedure to set a nose back to its normal position, and on June 22, 2018 he had a septoplasty to correct a deviated septum; these procedures resolved his functional nasal obstruction. Although the surgeon noted that the appearance of Grove's nose could be improved, cosmetic procedures are not deemed medically necessary. <u>Id</u>. In addition, Grove's records demonstrate that he has been approved for lumbar surgery and that Dr. Bomar ordered physical therapy for him pending the surgery. <u>Id.</u>

### C. Grove's Opposition and Defendants' Reply

Grove served an opposition to defendants' summary judgment motion and his Answers to Declarations on November 7, 2018. [Dkt. No. 37-38] Both were filed under penalty of perjury. As a general rule, the non-moving party may not defeat a properly-supported summary judgment motion by simply substituting the "conclusory allegations of the complaint or answer with conclusory allegations of an affidavit." <u>Lujan v. Nat'l Wildlife Fed'n</u>, 497 U.S. 871, 888 (1990). Even where the non-moving party in such a situation is a <u>pro se</u> prisoner entitled to liberal construction of his pleadings, a "declaration under oath ... is not enough to defeat a motion for summary judgment. He has to provide a basis for his statement. To hold otherwise would render motions for summary judgment a nullity." <u>Campbell-El v. Dist. of Columbia</u>, 874 F.Supp. 403, 406 (D.C. 1994). Grove's opposition essentially amounts to a recapitulation of the allegations in his complaint and for that reason is insufficient to create a genuine issue of material fact to defeat the defendants' summary judgment motion. Even if the substance of

13

plaintiff's filings are considered, however, defendants are entitled to the summary judgment they seek, as will be discussed below.

## IV. Analysis

A. Administrative Exhaustion

Pursuant to the Prison Litigation Reform Act ("PLRA"), "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." See 42 U.S.C. § 1997e(a); Woodford v. Ngo, 548 U.S. 81, 85 (2006) ("Exhaustion is no longer left to the discretion of the district court, but is mandatory."). The PLRA requires "proper" exhaustion, which demands "compliance with an agency's deadlines and other critical procedural rules." Woodford, 548 U.S. at 90-91, 93. In the context of prisoner suits, proper exhaustion provides prisons the opportunity to correct their errors before being hauled into federal court, reduces the quantity of prisoner suits by either granting relief at the administrative level or persuading prisoners not to further pursue their claim in a federal court, and improves the quality of the prisoner suits that are filed in federal court by creating an administrative record for the court to reference. Id. The benefits of proper exhaustion are only realized if the prison grievance system is given a "fair opportunity to consider the grievance" which will not occur "unless the grievant complies with the system's critical procedural rules." Id. at 95; see also Moore v. Bennette, 517 F.3d 717, 725 (4th Cir. 2008).

Defendants argue that Grove failed to exhaust administrative remedies as to his nose fracture prior to bringing this lawsuit. In fact, however, Health Services Administrator Hicks-van

14

Haren attests that Grove "exhaust[ed] the grievance process" with the respect to the treatment of the nasal fracture. [Dkt. No. 34, Ex. B, Hicks-van Haren Aff. ¶ 23] The claims based on Grove's nasal fracture thus cannot be dismissed based upon lack of administrative exhaustion.[3]

B. Deliberate Indifference

To establish that inadequate medical treatment rises to the level of an Eighth Amendment violation, a plaintiff "must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." Estelle v. Gamble, 429 U.S. 97, 105 (1976); Staples v. Va. Dep't of Corr., 904 F.Supp. 487, 492 (E.D.Va. 1995). To prevail on a claim of deliberate indifference, a plaintiff must demonstrate both the objective and the subjective component of the cause of action. Hudson v. McMillian, 503 U.S. 1, 20 (1992). The objective component consists of showing that plaintiff suffered from a sufficiently serious medical need. A serious medical need in this context has been defined as "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Bane v. Va. Dep't of Corr., 2012 WL 6738274 at *6 (W.D. Va. Dec. 28, 2012) (citations omitted); see, e.g., Cooper v. Dyke, 814 F.2d 941, 945 (4th Cir. 1987) (determining that intense pain from an untreated bullet wound is serious); Loe v. Armistead, 582 F.2d 1291 (4th Cir. 1978) (concluding that the "excruciating pain" of an untreated broken arm is serious).

The subjective component necessary to establish deliberate indifference requires a demonstration that prison medical personnel acted with a sufficiently culpable state of mind.

_____

[3]Defendants make no argument regarding the exhaustion of Grove's claims based on his spinal condition.

15

That is, the plaintiff must prove that a particular defendant actually knew of and disregarded "an excessive risk to human health or safety." Farmer v. Brennan, 511 U.S. 825, 835 (1994). To do so plaintiff must demonstrate both that facts existed from which the medical provider could infer the existence of a substantial risk of harm to plaintiff, and that the provider actually drew that inference. Id. at 837. Further, the plaintiff then must show that after drawing the inference, the provider disregarded the risk by failing to take "reasonable measures" to alleviate it, id. at 832, "by either actual intent or reckless disregard." Miltier v. Beorn, 896 F.2d 848, 851 (4th Cir. 1990). Courts have emphasized that the subjective component of a deliberate indifference claim is not satisfied by a showing of medical malpractice, since the wantonness necessary to establish a constitutional violation goes well beyond negligence or a failure to act reasonably. Patten v. Nichols, 274 F.3d 829, 834 (4th Cir. 2001). Nor can an "attempt to second-guess the propriety or adequacy of a particular course of treatment" received by an inmate establish deliberate indifference, Bowring v. Godwin, 551 F.2d 44, 48 (4th Cir 1977); instead, "[p]rison officials evince deliberate indifference to a serious medical need by completely failing to consider an inmate's complaints or by acting intentionally to delay or deny the prisoner access to adequate medical care." Hicks v. James, 255 Fed. App'x 744, 749 (4th Cir. 2007). In other words, the failure to provide treatment must have been"[s]o grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." Miltier, 896 F.2d at 851 (citations omitted).

A delay in medical treatment may constitute deliberate indifference. See Smith v. Smith, 589 F.3d 736, 739 (4th Cir. 2009) (citing Estelle, 429 U.S. at 104-05). In such cases, in addition to establishing that his medical need was objectively serious, a plaintiff also must show that the

delay in providing medical care caused him to suffer "substantial harm." See Webb v. Hamidullah, 281 Fed. App'x. 159, 166 (4th Cir. 2008); Shabazz v. Prison Health Servs., No. 3:10cv190, 2011 WL 2489661, at *6 (E.D. Va. Aug. 9, 2011). "The substantial harm requirement may be satisfied by lifelong handicap, permanent loss, or considerable pain." Shabazz, 2011 WL 2489661, at *6; see also, Coppage v. Mann, 906 F.Supp. 1025, 1037 (E.D. Va. 1995).

In the instant case, defendants acknowledge that Grove's fractured nose and lumbar spine condition constitute objectively serious medical needs and hence satisfy the first component of the foregoing test. [Dkt. No. 34, Def. Mem. at 17] Nonetheless, as they argue, Grove is entitled to no relief because his claims against all defendants fail on the subjective component.

As is apparent from the undisputed material facts outlined above, Dr. Rodgers and Dr. Carter thoroughly and appropriately addressed Grove's complaints regarding his lumbar spine. They assessed Grove's complaints of pain, examined him, ordered diagnostic testing, and provided courses of treatment that they believed to be appropriate based upon Grove's clinical presentation. In an effort to relieve or lessen Grove's pain, Dr. Rodgers prescribed a variety of medications, including Carbamezapine, Nortiptyline, Methocarbamol, Duloxetine, Naproxen, ibuprofen, a Lidocaine patch, a Ketorolac injection, and Prednisone. She also provided advice regarding Grove's ability to manage his pain through exercise. Similarly, Dr. Carter evaluated Grove on three occasions and ordered multiple treatment measures, including medications such as Gabapentin and Naproxen, physical therapy, and a two-piece jumpsuit. At no time did either physician ignore or disregard Grove's complaints related to his lumbar spine; instead, they exercised their professional judgment and provided Grove with considered care each time he

17

presented with lumbar issues.

Nor did Nurse Lemmons ignore Grove's medical needs. He saw Grove after the altercation that resulted in the nasal fracture and immediately referred Grove for further evaluation by Dr. Bomar. When Grove requested the following day to be seen by a plastic surgeon, Nurse Lemmons advised Grove that a request for further evaluation by a higher level provider was already pending. Grove did not complain of pain at that encounter, and Nurse Lemmons did not perceive any indication that Grove was in acute distress. Nurse Lemmons had no authority to prescribe medication for Grove, and Grove already had prescriptions for pain relievers including Tylenol and Excedrin.

Similarly, Ms. Hicks-van Haren made exhaustive attempts to address Grove's numerous requests and complaints concerning his medical treatment. Grove contends that her failure to order a bottom bunk profile for him violated his Eighth Amendment rights, but when Ms. Hicks-van Haren made that determination on April 19, 2018 it was based expressly on her review of Grove's medical records, which showed that when Dr. Carter had examined Grove three weeks earlier he noted that Grove was able to manipulate the examination table without difficulty and that a bottom bunk profile accordingly was not medically necessary. [Dkt. No. 34, Ex. B, Hicks-van Haren Aff. ¶ 38] Thus, Ms. Hicks-van Haren did not ignore Grove's medical needs, as he claims, but rather made a reasoned decision based on Grove's medical records and the observations of a physician who had recently examined him. Id. Grove also accuses Ms. Hicks-van Haren of failing to obtain treatment for his broken nose by an off-site specialist on April 25, 2018, but at a meeting with Grove on that date Ms. Hicks-van Haren and a nurse informed Grove that an offsite appointment was pending, and Ms. Hicks-van Haren contacted Dr. Bomar to

obtain a prescription for Grove's pain. Id. Although Grove contends that what he characterizes as a delay in scheduling the outside appointment was caused by Ms. Hicks-van Haren, she is not responsible for scheduling off-site appointments for inmates. Id. ¶ 39. Therefore, she cannot be liable for that decision. See Ashcroft v. Iqbal, 556 U.S. 662, 667 (2009) ("[E]ach Government official, his or her title notwithstanding, is liable for his or her own misconduct.").

Throughout Grove's pleadings are a number of allegations that defendants should have ordered different therapies for his lumbar spine condition and broken nose. For instance, in his Answers to Declarations, Grove accuses Dr. Rodgers of treating him like a "drug seeker" and wrongfully denying him a bottom bunk pass and a two-piece jumpsuit. [Dkt. No. 38] He also states or implies that defendants' refusals to provide him with Tramadol for his pain amounted to deliberate indifference. These arguments all fail, because the Eighth Amendment's "prohibition on cruel and unusual punishment is not violated when a doctor simply resolves 'the question whether additional diagnostic techniques or forms of treatment is indicated." Self v. Crum, 439 F.3d 1227, 1232 (10th Cir. 2006), quoting Estelle, 429 U.S. at 107. The evidence before the Court demonstrates that both Dr. Rodgers and Dr. Carter believed that Tramadol and other narcotic or narcotic-like medications were not appropriate for Grove's long-term pain management based on medical considerations involving both the inadvisability of prescribing such drugs in the prison setting and Grove's personal history of substance abuse. Under such circumstances, Grove's argument amounts to nothing more than his disagreement with Dr. Rodgers and Dr. Carter over the course of his treatment, and thus is insufficient to support a finding of deliberate indifference. See Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985); Russell v. Sheffer, 528 F.2d 318, 319 (4th Cir. 1975) (per curiam); Harris v. Murray, 761 F.

Supp. 409, 414 (E.D. Va. 1990).

Grove attaches as an exhibit to his Answers to Declarations the report of an initial

evaluation performed at the Southside Rehabilitation Center in Colonial Heights on October 30,

2017, and he asserts that it "clearly shows [he] had 40% loss of function." [Dkt. No. 38, Doc. 1]

It is true that the report contains that notation, but it also reflects that Grove was referred for the

evaluation by Dr. Carter, and it concludes with an analysis of Grove's condition and a

recommendation that matches the care the defendants provided: "He would benefit from a

physical therapy program including core stabilization/pelvic strengthening, lumbar/hip stretches,

progressive HEP, and modalities to relieve pain and restore function." Accordingly, the report

does not suggest that defendants were deliberately indifferent to Grove's medical conditions.

Grove also asserts that defendants in their declarations omitted the fact that he was

transported to Colonial Orthopedics on May 21, 2018, where the results of an MRI revealed that

he needed lumbar surgery. [Dkt. No. 38, Doc. 1] The fact that the defendants did not mention

this development in Grove's condition is not relevant, because the events that gave rise to the

portion of this action that concerns his lumbar condition occurred in February and October, 2017,

and there is no indication that Grove required lumbar surgery during that time period. As

discussed in detail above, Dr. Rodgers determined in February, 2017 based on her examination of

Grove that a conservative course of treatment for his lumbar condition was indicated, and as a

result she prescribed exercise therapy and ordered x-rays of the spine and medication for muscle

spasms. [Dkt. No 34, Ex. 1 at 5-6] In October, 2017, Dr. Carter observed no functional

abnormalities when he examined Grove and thus did not believe that an orthopedic evaluation

was clinically indicated. He thus continued to address Grove's complaints with conservative

20

measures including physical therapy and a prescription for Naproxen. In light of these and other measures taken by the defendants to treat Grove's medical conditions and mitigate his pain, he cannot establish that he was the victim of deliberate indifference. See Sosebee v. Murphy, 797 F.2d 179 (4th Cir. 1986) (where records indicated that prisoner received substantial medical treatment, medical defendants could not be shown to have been deliberately indifferent to his condition).

Grove contends that the defendants' decision to deny him a bottom bunk pass violated his rights under the Eighth Amendment. [Dkt. No. 38 at 1, 4] Because that decision was made by the defendants based on their clinical observation of Grove's condition, such as his ability to manipulate the examination table, Grove's argument in this regard again amounts only to a disagreement with the defendants over the course of his medical treatment and does not have Eighth Amendment implications. Wright, 766 F.2d at 849.

Grove asserts that when he saw Nurse Lemmons on April 18, 2018, he opined that "someone needed to set my nose back straight before it healed crooked," but no such porcedure was done. [Dkt. No. 38 at 6] Nurse Lemmons was aware at that meeting that Grove had been seen by Dr. Bomar the previous day and that Dr. Bomar had ordered an x-ray and pain medication and had scheduled a follow-up appointment. [Dkt. No. 34 at 3-4] He therefore assured Grove that the nose fracture would be addressed by a higher level provider who could determine the proper course of treatment for the injury. Under these circumstances, no deliberate indifference on Nurse Lemmons' part has been demonstrated.

Lastly, on November 13, 2018, Grove noticed a change of address from RRJ to Dillwyn Correctional Center. [Dkt. No. 39] Thus, even if Grove were otherwise entitled to relief in his

matter, his request for injunctive relief has been rendered moot. Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991) (holding that a prisoner's transfer moots claims for declaratory and injunctive relief).

## V. Conclusion

For the foregoing reasons, the Motion for Summary Judgment of Ms. Hicks-van Haren, Dr. Carter, Nurse Lemmons, and Dr. Rodgers will be granted. An appropriate Order and Judgment shall issue.

Entered this _29th_ day of _April_ 2019.

Alexandria, Virginia

_____ /s/

Liam O'Grady
United States District Judge